IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CRIMINAL ACTION |
| v. | ) | |
| | ) | NO. 1:20-CR-28-04-TCB |
| MARIO DUPREE GRAY | ) | |
| _____ | ) | |

## SENTENCING MEMORANDUM

Comes now, MARIO DUPREE GRAY, Defendant in the above-styled action, by and through undersigned counsel, submits his sentencing memorandum in mitigation of the sentence to be imposed on March 16, 2021.

## INTRODUCTION

Mario Dupree Gray is a combat veteran who served in both Afghanistan and Iraq[1]. He returned home to the United States, a changed man, according to his father who described him as being "totally different" upon his return.[2] Sadly, Mr. Gray recalls his childhood as a sort of battlefield where he saw his friends killed.[3] As he advised the probation officer who prepared the PSR, he began experiencing anxiety and depression as a child because he began "to wonder if he was going to be the next

---

[1] PSR, ¶81.

[2] Presentence Report (PSR), ¶63.

[3] PSR, ¶58.

shot or killed".[4]   After attending a military high school, Mr. Gray enlisted in the United States Army.[5]   Based on his combat experiences, Mr. Gray was diagnosed with a Traumatic Brain Injury (TBI), Post Traumatic Stress Disorder (PTSD), and Bi-Polar Disorder.[6] He has been receiving mental health treatment since leaving the military and while he has been on pretrial release.[7]   Notably, Mr. Gray had no prior criminal record when he entered the military in 2004 and sustained several convictions when he returned in 2008.[8]

In 2017, Mr. Gray was approached with a proposal that he marry Ivie Sajere and he later met with her "real" husband, Neville Sajere in exchange for money.[9]   At the time of the offer, Mr. Gray was unemployed and candidly acknowledged that he needed the money.[10]   He agreed and married Ms. Sajere which enabled her to seek an adjustment in her immigration status.[11]   After committing marriage fraud and arrest,

---

[4]PSR, ¶58.

[5] PSR, ¶¶60, 63, 78, 81.

[6] PSR, ¶¶65, 67.

[7] PSR, ¶¶65, 72.

[8] PSR, ¶¶37-52.

[9] PSR, ¶20.

[10] PSR, ¶21

[11] PSR, ¶¶20-22.

Mr. Gray agreed to cooperate with the government.  He was debriefed and agreed to testify for the government.[12]  He presently lives with his brother and his father while paying his share of the household expenses.[13]  Since November, 2020, Mr. Gray has been employed by the United Parcel Service (UPS) where he currently earns $22.00 per hour.

<u>CALCULATION OF THE APPLICABLE SENTENCING GUIDELINES</u>

The probation officer has correctly calculated the total offense level to be 9.[14] However, Mr. Gray has objected to his criminal history score and category.  He contends that the convictions listed in paragraphs 37, 38, 39, and 40 should not be counted as criminal history points as he had no representation.  Notably, there is **no record** to show that he was advised of his right to counsel or that he waived that right as to the convictions contained in paragraphs 37 and 38.  Moreover, there is no evidence that an adequate waiver was used in the convictions listed in paragraphs 39 and 40 of the PSR.

In response to undersigned counsel's objections, the probation officer rejected these objections based on a background note following U.S.S.G. §4A1.2 which provides that uncounseled convictions will result in criminal history points where

---

[12] PSR, ¶¶11, 21.

[13] PSR, ¶¶14-15.

[14] PSR, ¶34.

"imprisonment was not imposed".[15]   A term of imprisonment was imposed in all of these convictions: the convictions contained in  paragraphs 37 and 38 involved sentences of 180 days and the convictions contained in paragraphs 39 and 40 resulted in sentences of 60 days.  Consequently, the Background note is not applicable.  If these points are not counted, then Mr. Gray's criminal history score would be 11 and his criminal history category would be reduced to V.[16]  If the Court finds that these convictions should be counted as criminal history points, a variance or downward departure should be granted as the inclusion of these points would result in over-representation of his criminal history.  As previously noted, all of Mr. Gray's criminal history began after he was discharged with severe mental health challenges.

## ARGUMENT IN SUPPORT OF MITIGATION

The Sentencing Guidelines promulgated by the United States Sentencing Commission provide an advisory rather than a mandatory regime for determining what constitutes a reasonable sentence.  United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005(citing United States v. Booker, 543 U.S. 220 (2005)).  The Sentencing Commissions' guideline ranges are but generalizations.  United States v. Hunt, 459 F.3d 1180, 1184-85 (11th Cir. 2006).  The Court should consult the Guidelines, but the resulting range is but one factor that the Court must consider in

---

[15] PSR, ¶¶37-40.

[16] PSR, ¶47.

arriving at a reasonable sentence.   Crawford, 407 F.3d at 1178-79.   In its

consideration of the §3553(a) factors, the court may determine that the guideline

sentence:

> should not apply, perhaps because (as the Guidelines themselves
> foresee) the case at hand falls outside the "heartland" to which the
> Commission intends individual Guidelines to apply, U.S.S.G. §5K2.0,
> perhaps because the Guidelines sentence itself fails properly to reflect
> §3553(a) considerations, or perhaps because the case warrants a
> different sentence regardless.   See Rule 32(f).   Thus, the sentencing
> court subjects the defendant's sentence to the thorough adversarial
> testing contemplated by federal sentencing procedure.

Rita, 551 U.S. 338, 351 (2007).

As the Court in Rita observed, guideline calculations expressly exclude

consideration of certain offender characteristics. Rita, 551 U.S. at 360; see also Hunt,

459 F.3d at 1184 n. 4.  As the Supreme Court articulated in Gall v. United States, 552

U.S. 38  (2007), extraordinary circumstances are not required to justify an outside of

the guideline sentence. Gall, 552 U.S. at 47.

In fact, the Eleventh Circuit and other courts of appeal have held that a

sentence inside of the calculated guideline range can produce an unreasonable result.

United States v. Hunt, 459 F. 3d at 1184 ("There are, however, many instances where

the guideline range will not yield a reasonable sentence"); United States v. Jimenez-

Beltre, 440 F.3d 414, 518 (1st Cir. 2006) (en banc); United States v. Lazenby, 439

F.3d 928 (8th Cir. 2006).  As the First Circuit explained in Jimenez-Beltre,

>The guidelines are still <u>generalizations</u> that can point to outcomes that may appear unreasonable to sentencing judges in particular cases. Some of the guidelines in particular cases were not reflections of existing practice but were deliberate deviations or turned tendencies into absolutes. Others have been affected by directions from Congress. <u>Booker's</u> remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness.

<u>Jimenez-Beltre</u>, 440 F.3d at 518 (citation omitted).

Congress has mandated that the preliminary guidelines calculation be considered along with the other sentencing factors enumerated in §3553, a procedural requirement unaffected by <u>Booker</u> and its progeny. <u>See</u> 18 U.S.C. §3553(a); <u>Hunt</u>, 459 F.3d at 1184. After calculation of the custody range, it is within the Court's discretion to sentence within that guideline, or to impose a more severe or more lenient sentence than the applicable range, "provided the resulting sentence is reasonable in light of the §3553(a) factors". <u>United States v. Shelton</u>, 400 F.3d 1325, 1334 (11th Cir. 2005); <u>see also</u> <u>Gall</u>, 552 U.S. at 47. Section 3553(a) sets out the factors to be considered by the court with the caveat that the sentence be "sufficient but not greater than necessary" to achieve the purposes of sentencing contained in §3553(a)(2).

First, the nature and circumstances of the offense conduct in the instant case support a variance from the guideline range. The characterization of the offense conduct in the instant case is critical to determining a reasonable sentence for Mr.

Gray.  The lead defendants in the instant case, Neville Sajere and Ivie Sajere, are alleged to have engaged in extensive fraud including bank fraud, aggravated identity theft, and money laundering in addition to marriage fraud in relation to Kiera Fletcher and Mr. Gray.[17]  Mr. Sajere appears to have fled the United States and avoided prosecution.  There is no evidence that Mr. Gray or Ms. Fletcher engaged in any fraud beyond marriage fraud.[18]  While Mr. Gray was paid approximately $3,500 to marry Ms. Sajere, the Sajers profit from the fraud is alleged to be $878,000 while the intended loss is $1.2 million.[19]  Mr. Gray may have been aware that the marriage proposal might enable Ms. Sajere to obtain immigration status, but there is no evidence that he was aware of her and her husband's far more extensive fraudulent plans.  He, in relation to the Sajeres, is substantially less culpable.  Moreover, Mr. Gray has cooperated and agreed to testify, if necessary, as well as having plead guilty and accepted his responsibility which has saved both the Court and the government's resources.

Mr. Gray's history from his teenage years through his time as a soldier is fraught with battles against the demons in his mind and in combat.  As a teenager, he witnessed violence in the streets around his home.  His fear of what might happen to

---

[17] Doc. 1.

[18] PSR, ¶17.

[19] PSR, ¶17.

him in an atmosphere of random violence led to depression and anxiety. His struggles with mental health appear to have led him to act out at school. His father, who seemed unaware of his son's mental health issues, focused on his misbehavior at school and addressed the issue by placing his son in military school as he perceived the problem to be a lack of discipline which he hoped his son would acquire in a more structured environment. Consequently, it appears that Mr. Gray's mental health was neither diagnosed or treated. Appearing to follow his father's lead, Mr. Gray volunteered to serve in the U.S. Army. He fought in the early years of the wars in Afghanistan and Iraq where he witnessed violence and suffering on a far greater scale than on the streets of East Point. During one attack, he was physically injured in a blast that caused a TBI but his service also impacted him mentally as a later diagnosis for PTSD would demonstrate. Although he was awarded with metals for his courage against enemy forces, upon his return to civilian life in 2008, he was ill equipped to fight his inner demons[20]. His criminal history while more serious than his days of fighting in high school is reminiscent of that history of his inner struggles playing out externally in assaults. His mental health aggravated in part by his use of illicit drugs proved to be a toxic mixture which led to assaults and defiant confrontations with police. In the last two years, Mr. Gray has been far more able to avoid physical

---

[20] PSR, ¶81.

conflicts albeit he still struggles with his inner demons as evidenced by his emergency trips to Grady in the summer of 2020.[21]   However, he appears have reached an equilibrium by living with his father and maintaining a good paying full time job at UPS.  And his father appears to have recognized his son's need for counseling and medication to fully function.[22]  Given his present stability, a sentence of probation with a condition of home detention for a period of time rather than a prison sentence of two years would meet the purposes of sentencing as it is more likely that he will function and improve in a structured home with regular full-time employment and less likely to engage in more criminal conduct.

A sentence of probation is more reasonable given that the country is in the midst of the coronavirus pandemic and Mr. Gray, an African American with serious mental health issues is particularly vulnerable to hospitalization and death if he becomes infected with the Coronavirus-19.  At present, amongst  124,832 inmates and 36,000 BOP staff, the number of cases and deaths continue to rise: 47,714 inmates and 6,552 staff members have been infected and 225 inmates along with 4 staff members have died.[23]  As an African American man, Mr. Gray is at much greater

---

[21] PSR, ¶68.

[22] PSR, ¶63.

[23]  COCID-19  Cases,  BOP  ONLINE,  available  at http://www.bop.gov/coronavirus/ (Last visited March 11, 2021).

risk, as compared to White, non-Hispanic persons, is 2.9x more likely to be hospitalized and 1.9x more likely to die.[24]  The CDC has also acknowledged that racial and ethnic minority groups, including Black Americans, are carrying a disproportionate burden of illness and death because of COVID-19.[25]  Across several states, the data shows that, "Blacks consistently make up a higher density of coronavirus infections and deaths than do whites."[26]  By one estimate, "[n]ationally, African-American deaths from COVID-19 are nearly two times greater than would be expected based on their share of the population.  In four states, the rate is three or more times greater."[27]  Even when controlled for age, data shows that, "[i]n every age

---

[24] *Risk for COVID-19 Infection, Hospitalization, and Death by Race/Ethnicity*, CDC, Feb. 18, 2021, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html.

[25] *Health Equity Considerations and Racial and Ethnic Minority Groups*, CDC, July 24, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

[26] Philip Bump, *State data shows that black Americans are often overrepresented in coronavirus infections and deaths*, THE WASHINGTON POST, Apr. 7, 2020, https://www.washingtonpost.com/politics/2020/04/07/state-data-show-that-black-americans-are-often-overrepresented-coronavirus-infections-deaths/.

[27] Maria Godoy & Daniel Wood, *What Do Coronavirus Racial Disparities Look Like State By State?*, NPR, May 30, 2020, https://www.npr.org/sections/health-shots/2020/05/30/865413079/what-do- coronavirus-racial-disparities-look-like-state-by-state.

category, Black people are dying from COVID at roughly the same rate as white people more than a decade older."[28]  Indeed a number of compassionate release orders granting relief based in part on race by ordering their release have been issued in the Northern District of Georgia.[29]

In the pandemic, individuals with pre-existing mental health illnesses are at great risk of "significantly psychiatric symptoms, anxiety symptoms and depressive symptoms".[30]  In addition to his risk of becoming mentally less stable, Mr. Gray would undoubtedly experience greater stress due to his confinement at a time when he faces a grave risk of becoming infected.  Such stress only makes him more vulnerable.

Mr. Gray's diagnosis of TBI, PTSD, and Bi-Polar Disorder even with treatment, renders him more vulnerable than most prisoners to the COVID-19 disease.  Dr.

---

[28] Tiffany Ford et al., *Race Gaps in COVID-19 Deaths Are Even Bigger Than They Appear*, BROOKINGS, June 16, 2020, https://www.brookings.edu/blog/up-front/2020/06/16/race-gaps-in-covid-19-deaths-are-even-bigger-than-they-appear/.

[29] United States v. Hill, No. 1:05-CR-81-LMM-1 Doc. 45 (N.D.Ga. June 10, 2020); United States v. Jones, No. 1:18-CR-273-JPB-, Doc 21(N.D.Ga. Oct. 7, 2020); United States v. Hoard, No. 1:16-CR-383-LMM-4, Doc. 146 (N..D.Ga. Jan. 5, 2021); United States v. Miller, No. 1:02-CR-172-TCB, Doc. 313 (Jan. 7, 2021) and United States v. Samuda, No. 1:11-CR-484-MLB-1, Doc. 64 (N.D. Ga. Dec. 15, 2020.

[30] *Pandemicsand pre-existing mental illness: A systematic review and meta-analysis,* Kishen Neelam, Venu Duddu, Shon Lewis, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7683956/

Robert M. Sapolsky, a Stanford University professor and neuroendocrinologist, has written about the close relationship between mental health conditions, like depression, stress, and viral infections.  He has concluded that "stress compromises the ability of the immune system to defend the body against viral infections." Dr. Sapolsky states that a person who suffers from a mental health disorder, including depression, "necessarily experiences a higher degree of stress than a person who does not suffer from such a condition."  The chronic stress "will likely leave an individual at significantly higher risk of contracting COVID-19 and at significantly higher risk of serious illness or death if infected."

The doctor is hardly alone. According to other medical and mental health professionals, "[i]ndividuals suffering from serious mental illness can have compromised immunity and are at risk of severe illness and death during the coronavirus pandemic."  People with mental illness, "may become more fearful, agitated, and/or paranoid as a result of being quarantined to their jail cells for prolonged periods," which may substantially diminish their abilities to care for themselves in the prison environment.  In this way, then, Mr. Gray would be in danger.  Again the courts in the Northern District of Georgia have granted compassionate release motions based on mental health disorders similar to those of

Mr. Gray.[31]  Race combined with mental health issues have been noted as a basis for granting relief as well.[32]

The need for the sentence to reflect the goals of criminal justice, are met by a sentence of probation.  Incarceration is not warranted to meet any of these goals. Finally, such a sentence is also consistent with the need for the sentence to reflect both the factors considered relevant to sentencing in the guidelines manual as well as those factors which were not foreseen or anticipated.  A review of Mr. Gray's history, the nature of the offense, and the goals of sentencing are met in this case by imposing a sentence of probation.

WHEREFORE, Mr. Gray requests the Court consider his memorandum prior to imposing sentence and impose a sentence of probation.

---

[31] United States v. Knight, No. 1:06-CR-514-CAP, Doc. 115 (N.D.Ga. Mar.3, 2021); United States v. Brown, No. 1:18-CR-33-LMM-2, Doc. 52 (N.D.Ga. Oct. 30, 2020); United States v. de la Vaca, No. 1:07-CR-370-MLB, Doc. 101 (N.D.Ga. Nov. 20, 2020); United States v. Hunter, No. 2:09-CR-4-1, Doc. 63 (N.D.Ga. Dec.10, 2020); United States v. Lewis, No. 1:16-CR-442-ELR-2 (N.D.Ga. Aug. 6, 2020); United States v. Preston,No.1:19-CR-373-AT-1, Doc. 23 (N.D. July 31, 2020); United States v. Najera-Perez, No. 1:12-CR-232-CAP-2, Doc.276 (N.D. Ga. Sept. 16, 2020); and United States v. Roberson, No. 1:04-CR-311-AT-1, Doc. 83 (N.D. Ga. Feb. 2, 2021).

[32] United States v. Noble, No. 1:18-CR-319-AT-1, Doc. 25 (N.D.Ga. Jan. 8, 2021; United States v. Kellogg, No. 1:12-CR-383-CAP-1, Doc. 45 (N.D.Ga. July 8, 2020); and United States v. Wright, No. 1:14-CR-280-CAP-1, Doc. 32 (N.D. Ga. Sept. 21, 2020).

Dated:   This 12th day of March, 2021.

Respectfully submitted,

_s/ Suzanne Hashimi_
Suzanne Hashimi
State Bar No. 335616
Counsel for Mr. Gray

Federal Defender Program, Inc.
101 Marietta Street, Suite 1500
Atlanta, Georgia  30303
404/688-7530
Suzanne_Hashimi@fd.org

CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to the following Assistant United States Attorney of record:

> Diane Schulman, Esq.
> Assistant United States Attorney
> 600 Richard B. Russell Building
> 75 Ted Turner Drive, S.W.
> Atlanta, Georgia  30303

Dated: This 12th day of March, 2021.

*s/ Suzanne Hashimi*
Suzanne Hashimi